IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:10-CR-0128 |
|---|---|---|
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| JULIUS JAMES MONYOUKAYE | : | |

### MEMORANDUM

Presently before the court is a motion to suppress (Doc. 17), filed by defendant Julius James Monyoukaye ("Monyoukaye"), wherein Monyoukaye seeks to suppress evidence found on his person at the time of his arrest.[1] (See Doc. 17). Monyoukaye argues that the evidence at issue was found in violation of the Fourth Amendment. For the reasons that follow, the court will deny the motion.

---

[1] Monyoukaye's motion (Doc. 17 ¶¶ 14, 15) also requests that the court suppress any incriminating statements that Monyoukaye made after he was arrested, but before the police officers gave him Miranda warnings, on the basis that the statements were taken in violation of the Fifth Amendment. See Miranda v. Arizona, 384 U.S. 436 (1966). In subsequent briefs, however, Monyoukaye fails to support this portion of his motion, (see Docs. 19, 36); indeed, he does not even identify any statements that should be excluded from evidence. In light of this absence of argument, the court will deny this portion of his motion without further discussion.

  Monyoukaye has similarly abandoned the argument that the court should suppress evidence found in a storage unit to which he was a co-owner, because the police lacked probable cause to search the unit. His original motion raises this argument, (see Doc. 17 ¶ 18), but his supporting brief asserts simply that "an evidentiary hearing will be necessary to determine whether the evidence found at the storage locker . . . should also be ruled inadmissible[,]" in that it may have been "fruit of the poisonous tree," that is, a result of his allegedly unlawful arrest. (Doc. 19 at 5-6). His supplemental post-hearing brief places no focus on the search of the storage unit; rather, its subject is simply the lawfulness of his arrest. The court finds no basis to conclude that the search of the storage unit was not supported by probable cause, and therefore, this argument warrants no further discussion. Monyoukaye's "fruit of the poisonous tree" argument will be addressed *infra* note 6, after the court analyzes the lawfulness of Monyoukaye's arrest.

## I. Procedural Background

On April 21, 2010, Monyoukaye was indicted on the following three counts: (1) distribution and possession with intent to distribute heroin, cocaine base, and marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii), (b)(1)(B), and (b)(1)(D), and 18 U.S.C. § 2; (2) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and (3) possession of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 1.) On May 4, 2010, Monyoukaye entered a plea of not guilty to the three-count indictment. (Doc. 9.) Monyoukaye filed the instant motion to suppress (Doc. 17) on June 1, 2010, and he filed a supporting brief on June 9, 2010. The court conducted an evidentiary hearing on the instant motion on June 29, 2010, and ordered supplemental briefing. The motion has been fully briefed and is ripe for disposition.

## II. Findings of Fact[2]

On February 26, 2010, FBI Special Agent Chris Nawrocki, Trooper Chris Keppel, and Detective Craig Fenstermacher were conducting an investigation at Extra Space Storage, located at 900 Vogelsong Road, York, Pennsylvania. Specifically, they were investigating a possible connection between a storage unit at Extra Space and a major cocaine trafficker in the Philadelphia area, Nyene Baker. Baker had been arrested on February 24, two days prior, and at the time of his

---

[2] These findings are based on evidence presented at the June 29 hearing on the motion, and they reflect this court's assessment of the credibility of the testimony provided.

arrest, he had a piece of paper with the following writing on it: "ExtraSpace 900 Vogelsong Road, York, PA, Gate #1020*C12." The officers were aware that, in the past, authorities had found approximately twenty pounds of marijuana in a storage unit that Baker had used to facilitate his drug trafficking. This information prompted them to go to the Extra Space facility on Vogelsong Road, to gather information for a search warrant, and to secure the storage unit in question with a padlock supplied by the York County Drug Task Force.

The officers learned from Extra Space employees that unit C12 was rented on February 20, six days prior, by an individual who identified himself as Eric Richards. When Eric Richards rented the unit, he was accompanied by another individual, whom he identified as his brother Jamal Richards. Eric indicated that he was renting the locker for Jamal, because Jamal could not provide identification. Extra Space employees showed the officers a photocopy of Eric's driver's license, and they described Jamal as a black male in his early twenties. Extra Space employees also told the officers that the renter of each storage unit receives a unique code with which he or she can access the facility through the security gate. Generally, the codes are six digits that correspond to the renter's driver's license. Jamal Richards, however, requested the four-digit code 1020, rather than a six-digit code corresponding to Eric Richards's driver's license. In accordance with this request, the code 1020 was assigned, uniquely for the rental of unit C12.

The officers called a Pennsylvania State Police K-9 officer to the scene. Before the K-9 officer arrived, however, an Extra Space employee informed the

3

officers that the code 1020 was just entered at the security gate. The driver of a red Honda Civic had entered the code. He then proceeded to drive toward unit C12. Special Agent Nawrocki walked toward unit C12, and Detective Fenstermacher and Trooper Keppel went to Fenstermacher's unmarked police vehicle, which was parked outside the security gate. As Nawrocki approached unit C12, he saw the red Civic coming toward him. He showed his badge and yelled "stop, police" at least three times. When the red Civic did not stop after the first instruction, Nawrocki drew his weapon. After the third instruction to stop, the driver of the red Civic put the vehicle in reverse and drove it back down the row of storage units. Nawrocki ran to the security gate. Fenstermacher and Keppel pulled behind the red Civic in Fenstermacher's vehicle and activated the siren. The red Civic then came to a stop.

The officers detained the individuals in the vehicle,[3] including defendant Monyoukae, who was the driver.[4] Monyoukae identified himself as Jamal Jenkins and his date of birth as 1/10/1986, but he had no identification. He said that he lived in a motel, but he could not identify the motel. Keppel searched for records of a Jamal Jenkins with a date of birth of 1/10/1986, and he found none. Nawrocki then took a photograph of Monyoukae and showed it to the Extra Space employee who rented unit C12 to Eric and Jamal Richards, and the employee identified the man in the photograph as the same man who had identified himself as Jamal Richards six

---

[3] There was one passenger in the vehicle, Hanyia Brown.

[4] The driver was later fingerprinted at the booking center, and the fingerprint check revealed that his true identity was Julius James Monyoukaye.

4

days earlier. The officers then placed Monyoukae under arrest and took him to the York County Drug Task Force office.

Nawrocki and Fenstermacher were at the York County Drug Task Force office, preparing an application to obtain a search warrant, when they learned that the Pennsylvania State Police K-9 unit had arrived at Extra Space. A certified and trained drug detector team, consisting of Corporal Dan Housel and his canine, Nemo, analyzed the scene, and Nemo stopped at unit C12 and gave the trained response for detecting the scent of controlled substances. Nawrocki and Fenstermacher prepared an affidavit of probable cause, and a warrant for the search of unit C12 was subsequently issued. When officers executed the search, they discovered approximately four pounds of marijuana, various drug packaging and concealment items, and an AK-47 assault rife. In addition, when Monyoukae was searched pursuant to standard procedure,[5] authorities located approximately two grams of crack cocaine, contained in fifteen different packages, which had been concealed in his rectum.

## III. Conclusions of Law

Although the Fourth Amendment generally requires officials to obtain a warrant before searching persons or property, the search incident to arrest exception permits officers effectuating an arrest to conduct a contemporaneous

---

[5] All individuals arrested for narcotics offenses are strip searched at the booking center. They are given an opportunity to identify anything concealed on their person prior to the search, but the search is conducted regardless of whether or not they identify anything.

warrantless search of the arrestee and of "the space within an arrestee's 'immediate control[.]'" Arizona v. Gant, --- U.S. ---, 129 S. Ct. 1710, 1714 (2009) (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).  Underlying the search incident to arrest exception is the need to ensure officer safety and preserve evidence.  Id. at 1716 (citing United States v. Robinson, 414 U.S. 218, 230-34 (1973), Chimel, 395 U.S. at 763).  In order to determine the admissibility of the evidence found on Monyoukaye's person after his arrest, the court must evaluate the validity of the arrest.  See Michigan v. DeFillippo, 443 U.S. 31, 35 (1979) ("[A]n arresting officer may, without a warrant, search a person validly arrested. . . . The fact of a lawful arrest, standing alone, authorizes a search." (citing Robinson, 414 U.S. 218, 235)).

The Supreme Court has long recognized that a warrantless arrest of an individual in a public place does not violate the Fourth Amendment when it is supported by probable cause to believe that the individual committed a crime.  See United States v. Watson, 423 U.S. 411, 423-424 (1976); Maryland v. Pringle, 540 U.S. 366, 370 (2003).  When an officer has a reasonable suspicion that an individual has committed a crime, and that individual "deliberately takes flight [after] officers attempt to stop and question him[,]" then reasonable suspicion generally ripens into probable cause.  United States v. Laville, 480 F.3d 187, 195 (3d Cir. 2007); see also United States v. Cruz, 910 F.3d 1072, 1077 (3d Cir. 1990) ("Flight at the approach of law enforcement officers, when coupled with specific knowledge relating the suspect to evidence of a crime, is a proper factor to be considered in the decision to make an arrest.").  In the instant case, when the red Civic used the code

6

"1020" to enter the Extra Space storage facility, the officers had reasonable suspicion that the vehicle's occupants were involved in criminal activity, and after the driver attempted to flee, they had probable cause to arrest him.

With regard to the officers' reasonable suspicion, they had knowledge linking the user of the code "1020" to drug trafficking activity. Specifically, they knew that Baker, a large-scale drug supplier who had, on at least one occasion in the past, stored large quantities of drugs in a storage facility, had a paper reading "ExtraSpace 900 Vogelsong Road, York, PA, Gate #1020*C12" at the time he was arrested. They learned from Extra Space employees that, a few days prior to that, an individual who did not provide identification to the Extra Space employees rented unit C12 and requested the code "1020." In addition, while they were present at Extra Space, someone used the unique code "1020" to access the storage area, and this occurred just two days after Baker's arrest. All of this information would lead an objectively reasonable police officer to suspect that the person who used the code had a connection to Baker's drug trafficking activities.

Reasonable suspicion soon ripened into probable cause. The same individual who entered the facility by using the unique code "1020" then attempted to flee the scene after Nawrocki identified himself. When the officers detained him, he gave a false identity, and he stated that he was living in a motel, but he could not identify the motel. In addition, an Extra Space employee identified this individual as the same individual who came to rent storage unit C12 but failed to provide identification.

7

In light of all the circumstances of this case, the court concludes that Monyoukaye's arrest was supported by probable cause. The court therefore rejects Monyoukaye's argument that his arrest was unlawful.[6] Accordingly, the evidence recovered when Monyoukaye was searched, as an incident to this valid arrest, is admissible, and Monyoukaye's motion to suppress will be denied.

## IV. Conclusion

For the foregoing reasons, the court will deny Monyoukaye's motion to suppress. An appropriate order will issue.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated: November 2, 2010

---

[6] The conclusion that Monyoukaye's arrest was lawful obviates the need to address his argument that the evidence recovered from the storage unit is also inadmissible, as "fruit of the poisonous tree." See Wong v. United States, 371 U.S. 471 (1963). Nevertheless, the court notes the following. An impartial judge found probable cause, and issued the search warrant for storage unit C12, as a result of an affidavit that made no reference to the evidence found on Monyoukaye's person after his arrest. (Doc. 19, Ex. B at 2-3). There is no basis to conclude that the search conducted pursuant to Monyoukaye's arrest had any effect on the issuance of the search warrant for the storage unit. Under these circumstances, the evidence recovered from the storage unit could not possibly constitute fruit of the poisonous tree, even if the court assumes, *arguendo*, that Monyoukaye's arrest was unlawful.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**     :     **CRIMINAL NO. 1:10-CR-0128**
: 
**v.**     :     **(Judge Conner)**
:
**JULIUS JAMES MONYOUKAYE**     :

## **ORDER**

AND NOW, this 2nd day of November, 2010, upon consideration of defendant's motion to suppress (Doc. 17), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion to suppress (Doc. 17) is DENIED.

                                        S/ Christopher C. Conner
                                        CHRISTOPHER C. CONNER
                                        United States District Judge